# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Angela Renae Mayer, | Civ. No. 14-2732 (ADM/BRT) |
| Plaintiff, | |
| v. | |
| Carolyn W. Colvin, Acting Commissioner of Social Security, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

---

Meredith E. Marcus, Esq., Delay Disability Law PC, and Edward C. Olson, Esq., Disability Attorneys of Minnesota, counsel for Plaintiff.

Ana H. Voss, Esq., Assistant United States Attorney, counsel for Defendant.

---

BECKY R. THORSON, United States Magistrate Judge.

Plaintiff Angela Renae Mayer appeals the final decision of the Commissioner of Social Security ("the Commissioner") denying her application for disability insurance benefits. Pursuant to D. Minn. LR 7.2, the parties filed cross-motions for summary judgment. (Doc. Nos. 18, 25.) This matter is referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and D. Minn. LR 72.1. For the reasons stated below, this Court recommends that Plaintiff's motion be denied and Defendant's motion be granted.

# BACKGROUND

## I.   Procedural History

Plaintiff protectively filed a Title II application for disability insurance benefits on May 24, 2012. (Tr. 19, 166.)[1] The Social Security Administration ("SSA") denied her application on December 3, 2012, and again on reconsideration on April 3, 2013. (*Id*. at 104, 110.) At Plaintiff's request, a hearing was held before an Administrative Law Judge ("ALJ") on September 24, 2013. (*Id.* at 119, 130.) On October 25, 2013, the ALJ denied Plaintiff's application, and the Social Security Appeals Council denied her request for review on March 20, 2014. (*Id*. at 19–38, 6–10.) The Appeals Council's denial rendered the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. § 404.981.

Plaintiff timely filed this action on July 3, 2014, seeking judicial review under 42 U.S.C. § 405(g).[2] (Doc. No. 1.) The parties thereafter filed cross-motions for summary judgment. (Doc. Nos. 18, 25.) In her motion, Plaintiff alleges three errors by the ALJ. (Doc. No. 19, Pl.'s Mem. Supp. Mot. Summ. J. ("Pl.'s Mem.") 8, 15, 18.) She first argues that the ALJ insufficiently considered the impact of her migraine headaches when assessing her RFC. (*Id.* at 8–15.) Second, she argues that the ALJ improperly discounted her credibility. (*Id.* at 15–18.) Third, she argues that the ALJ did not properly weigh the "other source" opinions within the record. (*Id*. at 18–23.)

---

[1]      Throughout this Report and Recommendation, the abbreviation "Tr." is used to reference the Administrative Record (Doc. No. 15).

[2]      Plaintiff filed for and received more time to file her civil action beyond the sixty days allowed under 42 U.S.C. § 405(g). (Doc. No. 1 at 3.)

## II.    Factual Background

Plaintiff was born on February 12, 1973. (Tr. 166.) She completed high school and later took an administrative assistant course, which she completed in 1998. (*Id.* at 47–48.) Her most recent significant employment was as a part-time personal care provider in 2011. (*Id.* at 50–51.) Plaintiff also briefly acted as an assistant daycare provider where she would supervise children playing for a few hours in 2012. (*Id.* at 51.)

### A.  Medical History

Plaintiff was thirty-eight years old on her alleged disability onset date of November 1, 2011. (Tr. 166.) She alleged that the following conditions limited her ability to work: migraine headaches, nerve pain, fibromyalgia, irritable bowel syndrome, sleep issues, dizziness, syncope, and depression. (*Id.* at 201–02, 230–36.) The summary below addresses the conditions relevant to Plaintiff's appeal and is organized by condition.[3]

### i.    Daily Chronic Headache and Migraine Headaches

In 1989, at the age of sixteen, Plaintiff began experiencing frequent migraine headaches. (Tr. 677.) In March 1991, she underwent resection of the left C1 lesion, which proved to be a schwannoma, a form of tumor. (*Id.*) After the procedure, she continued to have difficulties with migraine headaches. (*Id.*)

During a visit with John E. Beithon, M.D., in May 2010, Plaintiff reported having a headache every couple of days that would be bad enough to require Zomig or Imitrex.

---

[3]    Although the record reflects visits and notations that relate to fibromyalgia, chronic subjective dizziness, sleep apnea and restless leg syndrome, syncope episodes, and irritable bowel syndrome, among other things, this Court does not summarize those here because those medical conditions are not directly at issue in this appeal.

(Tr. 461.) At that time, she missed an appointment with her therapist because she needed an appointment with her doctor regarding her headaches. (*Id.* at 433.) Her therapist, Ken Little, MA, LP, also noted a history of very severe headaches. (*Id.*)

In June 2010, Plaintiff underwent an occipital nerve block procedure. (Tr. 462.) She also underwent a magnetic resonance imaging ("MRI") examination of her cervical spine. (*Id.* at 444.) The examination revealed no spinal cord impingement or intramedullary lesion, no evidence for residual or recurrent C1 or C2 schwannoma, and no evidence for disc herniation or nerve root impingement. (*Id*. at 444.) But later in the month, she went to the emergency room for a headache that persisted until the next morning. (*Id.* at 463, 430.)

In July 2010, Plaintiff reported having frequent migraine headaches to her therapist, Mr. Little. (Tr. 428.) She stated that she sits at home with the shades drawn in order to minimize her pain. (*Id.*) She also began to suffer from anisocoria, a drooping of the eyelid, and ptosis, a difference in pupil size. (*Id.* at 460.) Dr. Beithon noted Plaintiff had about a 2mm difference in pupil size, which was likely due to her migraine headaches. (*Id.* at 464, 460.) Toward the end of the month, Plaintiff complained to Donald Somers, M.D., of a headache that lasted one week. (*Id.* at 465.) She reported some visual scintillation and photophobia but no nausea or vomiting. (*Id.*) The records reflect she had tried Toradol, Maxalt, and Medrol Dosepak. (*Id.*) At that time, she was prescribed Vicodin. (*Id.*)

In August 2010, Plaintiff continued to report intermittent headaches to Dr. Beithon. (Tr. 466.) She also had an eye exam, and Dr. Beithon again noted anisocoria

4

secondary to migraine and a history of ptosis secondary to migraine. (*Id.*) That month,

Plaintiff cancelled another session with her therapist due to a severe migraine. (*Id.* at

427.)

Plaintiff continued to report headaches in September 2010. (Tr. 353.) At a

neurology consult with Fred M. Cutrer, M.D. on September 8, 2010, she reported

approximately twenty-five headache days during the previous four weeks. (*Id.*) She

described the intensity of the headaches as "10 out of 10," lasting up to twelve hours with

the most severe headaches lasting up to eight hours. (*Id.*) Her headaches were sometimes

associated with sensitivity to light, smell, and sound. (*Id.*) At that time, Plaintiff took a

migraine disability self-assessment ("MIDAS") and scored seventy-seven, indicating

severe headache disability. (*Id.* at 358.) Plaintiff also reported that her headaches had

changed in nature since February; they changed from holocephalic, occurring over the

entire cranium, to a sharp stabbing pain located at the top of her head at the midline. (*Id.*)

Plaintiff underwent a CT Angiogram, which revealed a mild narrowing of the cervical

segment of the right internal carotid and a C1 and C2 laminectomy, compatible with a

history of C1-2 schwannoma resection. (*Id.* at 450–51.) Also, at a pain clinic screening

evaluation that month, Plaintiff described her headaches as "knife-like, right sided" and

rated her pain from her headache on that day as "5 out of 10." (*Id.* at 346.) She reported

that the headaches were aggravated by overexertion, physical activity, and stress. (*Id.*) In

addition, she complained that the headaches were impacting her exercise, yardwork,

housework, employment, socialization, and hobbies. (*Id.*)

Toward the end of October 2010, Plaintiff reported a two-day long migraine to Dr. Beithon. (*Id.* at 469.) She also reported a migraine in early November 2010 to Dr. Beithon. (Tr. 470.) Plaintiff otherwise stated no change in her conditions. (*Id.* at 471.) However, Plaintiff did note neck and cervical spine discomfort. (*Id.*) Plaintiff underwent another MRI, which provided similar results to her previous MRI. (*Id.* at 444.) She also underwent an MR angiogram of her neck, which revealed mild irregularities in the distal cervical segment of the right internal carotid and some irregularities in the proximal portion of the petrous segment. (*Id.* at 445.) The next month, she reported to Dr. Beithon that she felt well and her eyelid motion and ptosis were improving. (*Id.* at 473.)

During a neurology specialty evaluation with Dr. Cutrer in January 2011, Plaintiff reported suffering from five headache days over the last four weeks. (Tr. 335.) At that time, her MIDAS score was 55, indicating a severe headache disability, and Dr. Cutrer noted Plaintiff had a carotid dissection, which was potentially causing non-migrainous headaches. (*Id.* at 336.) Dr. Cutrer advised Plaintiff to continue taking Verapamil to reduce the frequency and severity of her headaches. (*Id.*) Also in January 2011, Julie E. Hammack, M.D., noted that she was pleased overall with Plaintiff's headache relief. (*Id.* at 341.)

In February 2011, Plaintiff continued to manage her migraines with Verapamil. (Tr. 332.) In March 2011, she reported having two to three headaches each week. (*Id.* at 474.) However, from April to May 2011, Plaintiff reported having about five headache days and explained that she continued to have about five headache days each month. (*Id.*

at 328–29.) At that time, her MIDAS score was 42, which indicated severe headache

related disability, and her Verapamil dosage was increased. (*Id.*)

During a neurology specialty evaluation two years later with Dr. Hammack,

Plaintiff reported suffering a particularly severe headache in September 2011. (Tr. 678.)

The headache lasted three days and caused her to miss nine days of school and work. (*Id.*)

Due to a worsening of her headaches, Plaintiff underwent a cervical MR angiography.

(*Id.* at 452.) The exam revealed a moderate extasia of the tortuous left upper cervical

internal carotid artery. (*Id.*) Her other arteries were otherwise unremarkable. (*Id.*)

Plaintiff also underwent another MRI that showed no residual or recurrent dissection. (*Id.*

at 454.) However, there was an abnormally diminished marrow signal potentially related

to anemia. (*Id.* at 455.) During this month, she continued to complain of both neck pain

and sharp migraines. (*Id.* at 480.)

In October 2011, Plaintiff reported that she had improved to the point where she

was only having one severe headache per month. (Tr. 325.) But she continued to

complain of a persistent and mild "dull headache." (*Id.*) Dr. Hammack opined that

Plaintiff's headaches, "though disabling, are benign in etiology." (*Id.* at 327.) Even so,

Plaintiff was reportedly concerned about her neck pain and chronic daily headaches. (*Id.*)

Her neck pain and migraines were worse in the early afternoon. (*Id.* at 397.) Plaintiff

explained that she was working under twenty hours each week, and it appears that

Dr. Beithon agreed that Plaintiff should continue this based on her symptoms.

(*Id.* at 482 ("She is working under 20 hours per week and continues to need to do this

based upon her headache and additional symptoms.").) In October, she also underwent another MRI which returned normal results. (*Id.* at 458.)

In November 2011, Plaintiff met with Ivan Garza, M.D., who opined that her daily headaches are migrainous and are likely affected and driven by an underlying cervicogenic etiology. (Tr. 320.) Dr. Garza suggested Plaintiff use Zomig as needed with some restrictions to prevent medication-overuse headache. (*Id.* at 321.) He noted that Zomig was helpful for her in the past. (*Id.*) At that time, Plaintiff also underwent "Alpha-Stim," a form of electrical stimulation for adjunctive relief. (*Id.* at 313.) However, she only noted a single instance in which her symptoms improved after this treatment and stated she had not experienced a significant improvement. (*Id.*)

In January 2012, Plaintiff noted her headaches improved on Verapamil. (Tr. 309.) She explained that she had run out of the prescription and realized that without it her headaches were much worse. (*Id.*) Her provider, Dr. Hammack, also noted that Plaintiff's chronic daily headaches were "well-controlled on [V]erapamil." (*Id.* at 312.) In addition, Plaintiff reported that she had started on Aleve, which seemed to help significantly; however, she noted that she has a headache every four to five days. (*Id.* at 309.)

Plaintiff underwent an evaluation for dizziness in February 2012, during which she noted dizziness occasionally preceded her migraines. (Tr. 301.) In addition, Plaintiff noted that while she was no longer having daily headaches, she was suffering from "full-blown migraines" about seven days per month. (*Id.* at 294.) She reported to her therapist, Mr. Little, that she was not always able to drive due to her aggravated symptoms. (*Id.* at 383.) At that time, she underwent another MRI of her cervical spine, which revealed

8

"new slight anterolisthesis of T1 upon T2 and T2 upon T3 with otherwise stable exam." (*Id.* at 364.)

Several months later, Dr. Garza noted during a July 2012 examination that Plaintiff had "actually quite improved when compared to the last time I saw her." (Tr. 501.) He noted that Plaintiff reported having fifteen headache-free days each month, which she attributed to a decrease in caffeine intake. (*Id.*) At approximately the same time, Plaintiff reported to Dr. Hammack that she had experienced thirty-four regular headaches and twenty-one migraine headaches since March. (*Id.* at 498.) The migraine headaches were characterized as severe and disabling. (*Id.*) In a later report, however, Dr. Hammack noted that Plaintiff took herself off Verapamil in August 2012 because she was "virtually headache free." (*Id.* at 638.) Her prescription ran out, and she noticed that she was having no headaches despite being off Verapamil. (*Id.* at 678.) She decided to remain off Verapamil but remained on her low dose of Gabapentin. (*Id.*)

In early October 2012, Plaintiff told Lisa M. Larson, M.D., in the emergency room that she has had "more headaches and more fatigue in the last week or so." (Tr. 542.) She underwent a cervical spine examination, which revealed a mild cervical spondylosis but no acute abnormalities. (*Id.* at 550.) A head scan examination also revealed no evidence of acute intracranial pathology. (*Id.* at 551.) An MRI neck angiography showed no changes compared to her previous examination. (*Id.* at 527.)

Five months later in March 2013, Plaintiff complained to Robert Needham, M.D., about a headache that lasted five days. (Tr. 620.) She reported back later that the headache was dulled by Toradil. (*Id.* at 626.) Shortly after that, she noted a new

headache, which she described as "a solid stabbing pain straight down on the top of her head and radiates all over and behind her eyes." (*Id.*) She explained that the headache was best around 1-2 p.m. and worse before she goes to bed. (*Id.*) Jonathan Larson, M.D., noted that the absence of an oral appliance, which was presumably prescribed to help with her sleep apnea, may be the driver of her headaches. (*Id.* at 628, 649.)

During a visit with Dr. Beithon in April 2013, Plaintiff reported having daily headaches since March 6, 2013. (Tr. 629.) She also noted that most days she was headache-free for only three to five hours. (*Id.*) Her headaches were assessed as medication overuse headaches and migraine headaches. (*Id.* at 631.) In May 2013, Dr. Hammack suspected that Plaintiff's recent resurgence may have been triggered by Plaintiff's dental disease, which apparently related to problems she developed with her wisdom teeth, and chronic daily pain relief use. (*Id.* at 638.) She recommended Plaintiff restart Verapamil as it had been helpful previously. (*Id.*) She also provided Plaintiff with a prescription for Ketoprofen and advised her to stay off Ibuprofen and Oxycodone. (*Id.*) In May 2013, Dr. Hammack noted that Plaintiff's headaches were present virtually every day and continued to be a problem. (*Id.* at 679.) Dr. Hammack also noted associated light and noise sensitivity and occasional vertigo associated with the headaches. (*Id.*) During this neurology specialty evaluation, Dr. Hammack diagnosed Plaintiff with "chronic daily headache with recent resurgence." (*Id.* at 680.)

### ii.   Mental Health

In February 2011, Plaintiff complained to her therapist, Mr. Little, of a panic attack that occurred during her physical therapy. (Tr. 415.)

In June 2011, Plaintiff underwent an evaluation for attention deficit disorder ("ADD"). (Tr. 476.) Joseph Van Kirk, M.D., noted that "it is fairly apparent that she does have ADD" and he prescribed Adderall. (*Id.*) Adderall caused Plaintiff to have insomnia, so she later switched to Concerta. (*Id.* at 478.)

A psychiatric screening performed on Plaintiff in July 2012 revealed symptoms of major depression, panic, agoraphobia, social phobia, PTSD, generalized anxiety, somatic symptoms, and health anxiety. (Tr. 510.) Her specific symptoms of PTSD included flashbacks, dreams of trauma, detachment, fear of death, difficulty sleeping, difficulty concentrating, nervousness, hypervigilance, and easily startled specifically due to the trauma associated with a sexual assault when she was twenty-one years old.[4] (*Id.*) Due to all of these symptoms, Plaintiff stated that for six days out of the last seven she missed work, school, or was unable to carry on her normal duties at home. (*Id.* at 511.) At that time, Dr. Hammack diagnosed Plaintiff with somatization disorder as well as a history of somatization disorder. (*Id.* at 499.) Jeffrey P. Staab, M.D. stated in August 2012 that Plaintiff did not need assistance with basic activities of daily living. (*Id.* at 511.)

In November 2012, James Baldus, Ph.D., LP, diagnosed Plaintiff with attention deficit hyperactive disorder, recurrent moderate major depressive disorder, PTSD, hypochondriasis, and conversion disorder, by history. (Tr. 589.) Dr. Baldus noted that Plaintiff had a number of symptoms supporting her diagnosis including sadness, impaired attention, and difficulty sleeping. (*Id.*) He also noted that Plaintiff's PTSD resulted in

---

[4]     In October 2011, Plaintiff told her therapist, Mr. Little, that she was sexually assaulted when she was twenty-one. (Tr. 397.)

anxiety, panic attacks, nightmares, hypervigilance, and heightened startle response. (*Id.*)
Dr. Baldus opined that Plaintiff might have difficulty working with the public or doing
work that required rapid pace or sustained attention but would otherwise not have
difficulty dealing with the stress of a workplace. (*Id.*)

### B. Hearing Testimony

#### i. Plaintiff's Testimony

An administrative hearing was held on September 24, 2013. (Tr. 46.) At the
hearing, Plaintiff testified as follows.  She confirmed that she had completed the twelfth
grade and completed an administrative assistant course in 1998. (*Id.* at 47–48.) She
testified that she had left her last full time position in 2004 to stay home with her
newborn daughter. (*Id.* at 50.) Since then, she worked part-time as a church secretary in
2010 and did personal care work in 2011. (*Id.* at 50–51.) She also helped a daycare
provider by briefly supervising children in 2012. (*Id.* at 51.) Plaintiff explained that she
briefly looked for part-time work that she thought would be compatible with her medical
appointments and health problems, but was unable to find anything. (*Id.* at 52.)

Plaintiff testified that she enjoys arts and crafts and used to do a lot of painting.
(Tr. 48.) She exercises by walking roughly one mile or less about two times each month.
(*Id.*) She tends to watch about an hour of television each day and occasionally spends one
to two hours each day on the computer doing brain teasers with her daughter or helping
her daughter study. (*Id.* at 49.)

Plaintiff testified that she is normally capable of preparing food but that her
concentration issues impeded her ability to perform other chores, such as dishes, laundry,

and particularly paperwork. (Tr. 53.) She explained that her boyfriend and other friends help her with cleaning, laundry, and preparing food for her children. (*Id.* at 52–53.) Her boyfriend also pays a friend to come over for a few hours each week to assist with cleaning, dishes, getting snacks for Plaintiff's children, and other chores. (*Id.* at 53.) Plaintiff explained that this friend also assists by driving her places such as the grocery store. (*Id.*) This friend has been helping Plaintiff for just over a year. (*Id.*)

Plaintiff testified that she suffers from a normal headache almost every day. (Tr. 52.) She also suffers from a migraine headache around eight to nine times each month. (*Id.*) She stated that the migraine headaches often occur two or three days in a row but sometimes as rarely as every other week. (*Id.*) She described her migraines as "really intense" and explained that she needs to sit up in a dark room to mitigate the pain from the pressure. (*Id.*) She also testified that she sometimes cannot speak well while having a migraine headache. (*Id.*) She recounted an incident in which she suffered from a migraine while shopping at a store and passed out in the aisle. (*Id.* at 54.) She testified that she does not drive if she is not feeling well, and she prefers to have someone with her, if possible. (*Id.*)

Plaintiff also testified that she often suffers from depression. (Tr. 54.) She said she has suffered from it since the age of eighteen and that it has been getting worse. (*Id.*) She explained that she suffers from anxiety stemming from her medical problems and that she suffers from anxiety when someone is doing something dangerous such as working on a furnace or electrical items. (*Id.*) She also said that she suffers from anxiety stemming from things that have not happened but could happen. (*Id.*)

In response to her counsel's questions, Plaintiff noted that she still suffers from post-traumatic stress disorder. (Tr. 55.) She explained that she was sexually assaulted when she was twenty-one and that she suffers panic attacks and flashbacks if she sees someone who resembles her attacker. (*Id.*)

Plaintiff testified that her doctors told her they were not sure whether her concentration issues were from "fibro fog" resulting from her fibromyalgia or from the attention deficit disorder. (*Id.* at 55–56.) She also noted that she suffers from fatigue partly due to her fibromyalgia and partly due to her medications. (*Id.* at 56.) In addition, she explained that her doctors found a carotid artery dissection and that she suffers from an increased risk of stroke. (*Id.* at 57.) She noted that she still has Horner's Syndrome, which causes uneven pupil dilation when she has a migraine. (*Id.*) She also indicated that she had a brain tumor removed in 1991, as well as had a laminectomy performed where they removed the top of two of her vertebrae. (*Id.* at 58.) She explained that though she tries to sleep between six to eight hours each night, she does not get a very restful sleep. (*Id.*)

### ii. Medical Expert's Testimony

Karen H. Butler, Ph.D., testified as a medical expert during the hearing. (Tr. 53, 147.) She testified that Plaintiff has been diagnosed with recurrent major depression that is noted in some records to be moderate. (*Id.* at 59.) She noted that Plaintiff has also been diagnosed with anxiety, anxiety not otherwise specified, and general anxiety disorder with features of panic and with post-traumatic stress disorder. (*Id.* at 59–60.) She discussed Plaintiff's somatization disorder, a history of somatization, and a diagnosis of

personality disorder and attention deficit hyperactivity disorder. (*Id.*) She commented, however, that the testing involved with the latter diagnosis was not present in the record. (*Id.*) She testified that the depression, somatization, and post-traumatic stress disorder are the diagnoses that are clearly outlined in the record. (*Id.*)

In review of the "A criteria,"[5] Dr. Butler explained that "the record notes anhedonia, appetite disturbance with weight change, sleep disturbance, psychomotor retardation, decreased energy, diminished concentration, feelings of worthlessness and occasional suicidal ideation." (Tr. 60–61.) She noted that post-traumatic stress corresponds to symptoms of "nightmares, flashbacks, hyper-vigilance, exaggerated, startle and intrusive recollection." (*Id.* at 61.) She also pointed to other symptoms in the record synonymous with generalized anxiety disorder, including "apprehensive expectation, irritability, dizziness, numbness and heart pounding." (*Id.*) She explained that those symptoms "are sub-threshold to meet diagnoses for both [generalized anxiety disorder and panic], and thus would be subsumed under the anxiety NOS."[6] (*Id.*)

Regarding the "B criteria," Dr. Butler testified that Plaintiff's activities of daily living are moderately impaired. (Tr. 61.) She noted that the record indicates that Plaintiff could cook, do some laundry, sweep, wipe the counters, and was independent in her own personal care. (*Id.*) She also noted that Plaintiff ran errands as needed, could do the

---

[5]    Each social security listing for mental disorders generally consists of three parts: a set of medical findings (paragraph A criteria); a set of impairment-related functional limitations (paragraph B criteria); and additional functional criteria (paragraph C criteria). *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(A).

[6]    "NOS" meaning "not otherwise specified."

dishes, was able to watch television, enjoyed painting, and helped the children get ready for school. (*Id.*) She indicated that Plaintiff could perform these tasks independently at least through February 2013, but further noted that Plaintiff occasionally had assistance from a friend for doing the laundry, cleaning, and helping with the children. (*Id.* at 61– 62.) Regarding Plaintiff's social functioning, Dr. Butler testified that Plaintiff reported having phone and email contact with others two to three times each week but noted the record indicated that she was isolating more. (*Id.*)

Dr. Butler testified regarding Plaintiff's concentration, stating that Plaintiff was able to remember three of three objects after five minutes and two of three objects after thirty minutes. (Tr. 62–63.) Plaintiff was able to recite seven digits forward and five digits backward, which was within normal limits. (*Id.* at 63.) In addition, Plaintiff was able to compute serial sevens. (*Id.*) Dr. Butler, however, noted that Plaintiff was often off-track and that she rambled and was difficult to redirect. (*Id.*) The record also indicated that Plaintiff had difficulty maintaining pace and persistence. (*Id.*) She did not doubt that, as the record reflected, Plaintiff would be off task twenty-five percent of the time; however, she pointed out that this conclusion was based on Plaintiff's self-reporting and the observation of a therapist with no real psychological testing noted in the record. (*Id.* at 63.) Finally, Dr. Butler pointed out that Plaintiff had no episodes of decompensation hallmarked by psychiatric hospitalization of two weeks duration or greater, nor any placement in day treatment or an increased frequency in outpatient psychotherapy. (*Id.*)

Regarding the "C criteria," Dr. Butler did not find any, because the comments in the record about Plaintiff's difficulty with concentration and maintaining her persistence

and pace are almost one year apart. (Tr. 63.) Dr. Butler noted that Plaintiff's global

assessment of functioning scores indicated moderate impairment. (*Id.* at 63–64.) She

concluded that while Plaintiff's conditions were severe, she did not meet or exceed the

medical listings. (*Id.* at 64.) Based on the record, Dr. Butler opined that Plaintiff's

impairments would limit her to unskilled to semi-skilled work where there is only brief

and superficial contact with others. (*Id.*)

### iii.   Vocational Expert's Testimony

Steven D. Bosch testified at the administrative hearing as a vocational expert.

(Tr. 65, 145.) The ALJ posed a hypothetical question to Bosch about a person with a high

school education, with similar work experience as Plaintiff, who is impaired by

fibromyalgia, headaches that are variously described as migraines, irritable bowel

syndrome, a sleep disorder, Raynaud's disease, occasional vertigo, anemia status post-

laminectomy, residual neck pain, depression, post-traumatic stress disorder, anxiety not

otherwise specified, and somatoform disorder.[7] (*Id.*) The individual is also limited to

lifting and carrying twenty pounds occasionally and ten pounds frequently but can

otherwise do all functional aspects of light work. (*Id.*) The individual would also be

limited to work where there would be no bright strobing lights, heights, ladders,

scaffolding, or dangerous or hazardous equipment or machinery. (*Id.*) The individual

would be limited to where there is easy access to bathrooms and be further limited to

unskilled to semi-skilled work and only have brief or superficial contact with others. (*Id.*)

---

[7]      As stated above, most of these impairments are not at issue in this appeal.

Based on that hypothetical, Bosch testified that such a person would not be able to perform Plaintiff's past work, however, there would be work available in the national economy for such a person. (*Id.* at 65–66.) He noted that such a person would be able to work as an office helper, of which there are about 4,000 positions in Minnesota; bench assembly, of which there are about 10,000 positions in Minnesota; and molding machine tender, of which there are about 2,000 positions in Minnesota. (*Id.*)

The ALJ then refined the hypothetical to a person who is off task twenty-five percent of the time or more during the workday and would be absent more than four days each month. (Tr. 66.) The person would have no ability to maintain regular attendance, sustain an ordinary routine, perform at a consistent pace, or work in coordination or proximity with others. (*Id.*) The person would also have a marked, but not precluded, ability to get along with others, respond appropriately in the workplace, understand or remember complex instructions, sustain an ordinary routine without special instructions, or complete a normal workday without interruptions from psychologically based symptoms. (*Id.* at 67.) Bosch indicated that such a person would be precluded from all work in the national economy. (*Id.*)

Finally, Bosch indicated that his statistics were from the second quarter of 2012, that because the economy has gotten a bit better there would be an increase in the number of jobs open since then, that he has been working in vocational placement and rehab for thirty years, and that he has placed persons with similar restrictions as the hypothetical person in the first hypothetical. (*Id.*)

## C. ALJ's Findings and Decision

On October 25, 2013, the ALJ denied Plaintiff's application for disability benefits. (Tr. 38.) The ALJ determined that Plaintiff was not disabled as defined by the Social Security Act, from November 1, 2011, through the date of decision. (*Id.* at 37.) The ALJ followed the five-step evaluation process dictated by 20 C.F.R. § 404.1520(a)(4), which involves the following determinations: (1) whether Plaintiff is involved in "substantial gainful activity;" (2) whether Plaintiff has a severe impairment that significantly limits her mental or physical ability to work; (3) whether Plaintiff's impairments meet or equal a presumptively disabling impairment listed in the regulations; (4) whether Plaintiff has the residual functional capacity to perform her past work; and (5) if Plaintiff cannot perform her past work, whether the government has shown that Plaintiff can perform other work, and that there is a sufficient number of those jobs available in the national economy. *See Fines v. Apfel*, 149 F.3d 893, 894–95 (8th Cir. 1998).

At step one, the ALJ determined that Plaintiff had not engaged in any gainful activity since the alleged disability onset date of November 1, 2011. (Tr. 21.) The ALJ noted that Plaintiff did perform work after the disability onset date, but that work did not rise to the level of substantial gainful activity. (*Id.*) At step two, the ALJ found that the Plaintiff had "the following severe impairments: chronic pain; obesity; sleep apnea; chronic headache and migraine; fibromyalgia; chronic subjective dizziness; restless leg syndrome; syncope episodes, unexplained; past history of irritable bowel syndrome; somatization disorder; major depressive disorder; residual traumatic stress symptoms;

19

generalized anxiety disorder with elements of panic; and history of attention deficit-hyperactive disorder, in attentive type." (*Id.*)

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any of the impairments listed in 20 C.F.R., Part 404, Subpart P, App. 1. (*Id.* at 22.) The ALJ concluded that Plaintiff did not meet the criteria necessary to show a mental impairment-related functional limitation that would be incompatible with the ability to do any gainful activity. (Tr. 22–24.) The ALJ determined that Plaintiff suffered moderate restriction in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration. (*Id.* at 23.) The ALJ concluded that these findings were consistent with the Plaintiff's daily living activities as well as medical opinions in the record and the evidence taken as a whole. (*Id.* at 22–23.)

The ALJ ultimately determined that Plaintiff had the residual functioning capability ("RFC") to perform sedentary work as defined by 20 C.F.R. §§ 404.1567(b). (Tr. 24.) The ALJ also added limitations of bright, strobing lights; no climbing ladders or scaffolds; no working at heights or around dangerous hazards such as machinery; easy access to bathroom facilities; no more than unskilled to semi-skilled work; and only brief and superficial contact with others. (*Id.* at 24–25.)

At step four of the disability determination, the ALJ found that Plaintiff could not perform any of her past relevant work. (Tr. 36.) But, at step five of the disability determination, the ALJ credited the opinion of the vocational expert that Plaintiff could

work as an office helper, of which there are 4,000 positions available in Minnesota, a bench assembler, of which there are 10,000 positions available in Minnesota, or a molding machine tender, of which there are 2,000 positions available in Minnesota. (*Id.* at 37.) Because Plaintiff was able to perform other work existing in significant numbers in the national economy, the ALJ found that she was not disabled within the meaning of the Social Security Act. (*Id.* at 37–38.) Accordingly, the ALJ denied her applications for disability benefits. (*Id.*)

## DISCUSSION

### I.      Standard of Review

Congress has prescribed the standards by which Social Security disability benefits may be awarded. "Disability" under the Social Security Act means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "An individual shall be determined to be under a disability only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

This Court has the authority to review the ALJ's final decision denying disability benefits. *See* 42 U.S.C. § 405(g); *Kluesner v. Astrue,* 607 F.3d 533, 536 (8th Cir. 2010). "We will affirm the ALJ's findings if supported by substantial evidence on the record as

a whole." *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011) (quoting *Medhaug v. Astrue*, 578 F.3d 805, 813 (8th Cir. 2009)). The Court "must consider evidence that both supports and detracts from the ALJ's decision, but . . . will not reverse an administrative decision simply because some evidence may support the opposite conclusion." *Id.* (internal quotation marks omitted).

Substantial evidence is less than a preponderance, but it is enough that a reasonable mind would accept it as sufficient to support the decision. *McDade v. Astrue,* 720 F.3d 994, 998 (8th Cir. 2013). The Court will not reverse the ALJ's decision simply because the record supports a contrary conclusion. *Id.* If it is possible to draw two inconsistent conclusions from the evidence, one of which supports the ALJ's findings, the Court must affirm the ALJ's decision. *Whitman v. Colvin*, 762 F.3d 701, 706 (8th Cir. 2014). The Court may not substitute its own opinion for that of the ALJ, even if the Court would have reached a different conclusion in the first instance. *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993). "Our review of the ALJ's factual determinations, therefore, is deferential, and we neither reweigh the evidence, nor review the factual record *de novo*." *Flaherty v. Halter*, 182 F. Supp. 2d 824, 843 (D. Minn. 2001).

The plaintiff bears the burden of proving disability. 20 C.F.R. § 404.1512(a); *Whitman* 762 F.3d at 705. If the plaintiff meets this burden and establishes an inability to do past relevant work, the burden then shifts to the Commissioner to prove "that the Plaintiff retains the RFC to do other kinds of work, and second, that other work exists in substantial numbers in the national economy that the Claimant is able to perform." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005).

## II.        Analysis of ALJ's Decision

Plaintiff alleges three errors by the ALJ. (Doc. No. 19, Pl.'s Mem. 8, 15, 18.) She first argues that the ALJ insufficiently considered the impact of her migraine headaches when assessing her RFC. (*Id.* at 8–15.) Second, she argues that the ALJ improperly discounted her credibility. (*Id.* at 15–18.) Third, she argues that the ALJ did not properly weigh the "other source" opinions within the record. (*Id*. at 18–23.)

### A.  Plaintiff's RFC

A plaintiff's RFC represents the maximum capability under which she can function considering her limitations. 20 C.F.R. § 404.1545(a)(1). It is assessed through all relevant evidence in the record including medical records, observations of treating physicians, and a plaintiff's own statements. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). "While the ALJ must consider all of the relevant evidence in determining a claimant's RFC, the RFC is ultimately a medical question that must find at least some support in the medical evidence of record." *Casey v. Astrue*, 503 F.3d 687, 697 (8th Cir. 2007) (citing *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004)).

The ALJ determined that Plaintiff could perform light work which, among other restrictions, involved no bright or strobing lights. (Tr. 24.) Plaintiff argues that the ALJ failed to properly account for her migraines when formulating her RFC. (*See* Pl.'s Mem. 14–15.) Specifically, she argues that lighting is not the only trigger for her migraines and the RFC did not take into account work absences due to migraines. (*Id.*)

This Court concludes there is substantial evidence in the record to support the ALJ's RFC determination.  As the ALJ noted, the record supports a finding that

Plaintiff's migraines were reasonably mitigated through treatment. (Tr. 31–32.) In January 2012, Dr. Hammack noted that Plaintiff's headaches had improved on Verapamil. (*Id.* at 309.) Dr. Hammack's January report also noted that Plaintiff's chronic daily headaches were "well-controlled on Verapamil." (*Id.* at 312.) Further, Plaintiff's headaches apparently improved to the point where she voluntarily took herself off her medication. (*Id.* at 638.) She remained off of Verapamil because "she was virtually headache free." (*Id.*)

Plaintiff argues that these improvements were taken out of context and ignores the periods in which Plaintiff was suffering from chronic headaches. (Pl.'s Mem. 12.) But, Plaintiff's headaches were generally precipitated by treatable causes. Dr. Garza noted a decrease in caffeine intake impacted Plaintiff's headache frequency and suggested she remove caffeine entirely from her diet. (Tr. 501.) He further explained that removing caffeine could "significantly impact migraine and overall headache frequency." (*Id.*) Further, after Plaintiff stopped taking Verapamil, she experienced a resurgence in headaches in March 2013. (*Id.* at 638.) Dr. Hammack, however, suggested that the resurgence was attributable to Plaintiff's dental disease and chronic daily analgesic use. (*Id.*) Dr. Beithon came to a similar conclusion and assessed Plaintiff's resurgence of headaches as "medication overuse headache." (*Id.* at 631.) Plaintiff was restarted on Verapamil as it was "previously very helpful to her." (*Id.* at 638.) Because the ALJ properly determined that Plaintiff's headaches were controllable, he was not required to include further limitations in his RFC. *See Martise v. Astrue*, 641 F.3d 909, 924 (8th Cir. 2011) ("Because [claimant's] migraine headaches are controllable and amenable to

treatment, they do not support a finding of disability."); *see also Qualls v. Apfel*, 158 F.3d 425, 427 (8th Cir. 1998) (same).

Substantial evidence in the record also supports the ALJ's conclusion to include only a lighting restriction in Plaintiff's RFC. Plaintiff noted during the hearing that during intense headaches she needs to sit in a dark room. (Tr. 52.) In addition, Dr. Hammack noted that Plaintiff's headaches were associated with light and noise sensitivity. (*Id.* at 679.) Yet, during an examination for vertigo, she was noted to have "no nystagmus or abnormal eye movements noted to increasingly intense sounds into the right or left ear." (*Id.* at 372.) Further, Plaintiff does not indicate how adding any additional triggers, such as auditory, would impact the vocational expert's testimony in this case. The vocational expert noted a hypothetical person with Plaintiff's limitations would be able to perform as an office helper, in a bench assembly position, and as a molding machine tender. (*Id.* at 66.) The record also indicates that flagger, usher, and ticket taker, are potential sources of employment as well. (*Id.* at 85.) Nothing in the description of these occupations, with the possible exception of flagger, a construction position, would implicate a loud noise sensitivity precluding their applicability. Thus, the ALJ's failure to include other potential triggers in the RFC, was at worst, harmless error. *See Byes v. Astrue*, 687 F.3d 913, 918 (8th Cir. 2012) (stating that the case would not have been decided differently absent ALJ's error in determining claimant's RFC); *Hepp v. Astrue*, 511 F.3d 798, 806 (8th Cir. 2008) (declining to remand for alleged error in opinion when error "had no bearing on the outcome").

### B. Plaintiff's Credibility

An ALJ must consider specific factors when making a credibility determination and when discounting a claimant's subjective complaints. *Halverson v. Astrue*, 600 F.3d 922, 931 (8th Cir. 2010). The ALJ must consider "the claimant's prior work history; daily activities; duration, frequency, and intensity of pain; dosage, effectiveness and side effects of medication; precipitating and aggravating factors; and functional restrictions." *Id.* (citing *Medhaug v. Astrue*, 578 F.3d 805, 816 (8th Cir. 2009)). An ALJ may also consider an absence of objective medical evidence, "although the ALJ may not discount a claimant's subjective complaints solely because they are unsupported by objective medical evidence." *Halverson*, 600 F.3d at 932. Where the ALJ gives good reasons for discounting a claimant's credibility, this Court will defer to the ALJ's judgment, even where every factor is not discussed in depth. *Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012).

This Court concludes that the ALJ properly discounted Plaintiff's credibility based on the evidence in the record. The ALJ examined the record and cited to the specific elements that impacted her determination. The ALJ discussed Plaintiff's work history, cited Plaintiff's daily activities inconsistent with her claims of disability, cited statements by medical providers regarding the precipitating and aggravating factors for her impairments, the effectiveness of Plaintiff's medication, the lack of functional restrictions, and the absence of objective medical evidence.

First, while the ALJ acknowledged Plaintiff's work history from 1989 ending in 2012, the ALJ noted that Plaintiff had not "aggressively attempted to return to work or

26

look for other work at the same or lesser exertional level." (Tr. 34.) Normally, "a

claimant with a good work record is entitled to substantial credibility when claiming an

inability to work because of a disability." *Nunn v. Heckler*, 732 F.2d 645, 648 (8th Cir.

1984).  However, here, the ALJ concluded that Plaintiff's failure to attempt to seek out

work through the Work Force Center or Department of Vocational Rehabilitation at the

same or lesser exertional levels undermined "her claim of a total inability to work at all

exertional levels." (Tr. 34); *see Ostronski v. Chater*, 94 F.3d 413, 419 (8th Cir. 1996)

(stating that evidence of lack of motivation to work provided another basis upon which

the ALJ had reason to discredit Plaintiff's subjective complaints); *see also DeLuca v.

Astrue*, Civ. No. 10-2032 (JNE/FLN), 2011 WL 2633851, at *13 (D. Minn. May 25,

2011) (finding the ALJ's consideration of Plaintiff choosing to not follow a

recommendation by his occupational therapist to consider contacting the Minnesota

Workforce to explore vocational options proper in determining Plaintiff's credibility);

*Bartlett v. Astrue*, No. CIV. 09-3203 (PAM/JJK), 2010 WL 4386893, at *20 (D. Minn.

Oct. 7, 2010) *report and recommendation adopted*, No. Civ. 09-3203 (PAM/JJK), 2010

WL 4386891 (D. Minn. Oct. 28, 2010) (concluding that the evidence in the record

supported the ALJ's finding that Plaintiff's failure to seek vocational rehabilitation or

full-time employment is a negative credibility factor when the Plaintiff left last

employment for reasons other than that he could no longer perform the job).

     Second, the ALJ examined Plaintiff's daily activities and determined that she

retained "the ability to perform a wide range of activities inconsistent with her allegations

of incapacitating pain and mental limitations." (Tr. 36.) Physically Plaintiff was able to

prepare meals for herself and her children including cooking pizza, chicken nuggets, some hot dishes, sandwiches, and frozen foods three to five days each week. (*Id.* at 203.) She also was able to clean or perform filing with some assistance, clean laundry, hang pictures, sweep, and wipe down counters. (*Id.*) She was able to drive or walk to stores to shop for groceries and clothing. (*Id.* at 204.) Most significantly, Dr. Staab noted specifically that "Mayer does not need help with basic activities of daily living." (*Id.* at 511.) Patterns of daily living inconsistent with claims of pain diminish credibility. *See Haley v. Massanari*, 258 F.3d 742, 748 (8th Cir. 2001) (stating that the ALJ properly discounted credibility where claimant "took care of his personal needs, washed dishes, changed sheets, vacuumed, washed cars, shopped, cooked, paid bills, drove, attended church, watched television, listened to the radio, visited friends and relatives, and read"); *see also Shannon v. Chater*, 54 F.3d 484, 487 (8th Cir. 1995) (holding claimant's complaints of pain inconsistent with statements that he cooked breakfast, performed chores with help occasionally, visited friends and relatives, and attended church twice a month).

Third, regarding Plaintiff's medications, the ALJ noted that Dr. Hammack recommended trying a transition from Gabapentin to Pregabalin. (Tr. 26.) The ALJ also observed Dr. Garza's comments regarding Plaintiff's medications including changing Ketoprofen to Naproxen Sodium, Zomig being unhelpful, and whether to try Axert or Lyrica. (*Id.* at 27.) The ALJ acknowledged Dr. Hammack's diagnosis that Plaintiff's chronic daily headaches were "well controlled on Verapamil." (*Id.* at 27, 312.) And, the ALJ discussed Plaintiff's present medication scheme and noted a lack of reported

significant side effects in the record. (*Id.* at 28.) Importantly "[i]f an impairment can be controlled by treatment or medication, it cannot be considered disabling." *Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004) (citing *Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995)); *see also Orr v. Astrue*, No. 3:11-CV-03065-JRM, 2012 WL 3871864, at *4 (W.D. Ark. Sept. 6, 2012) (upholding an ALJ's determination that migraines were not severe due to treatment with medication).

Fourth, the ALJ noted that Plaintiff's headaches were precipitated by certain events that caused or aggravated her symptoms. (Tr. 28.) For example, Plaintiff reported to Dr. Garza a reduced number of headaches after she reduced her own caffeine intake and Dr. Garza suggested completely eliminating her caffeine intake. (*Id.* at 501.) In addition, after being "virtually headache free" in August of 2012, Dr. Hammack suspected a resurgence of headaches was triggered by Plaintiff's dental disease and chronic analgesic use. (*Id.* at 638.) At the same time, she suggested Plaintiff restart on Verapamil which was "previously very helpful to her." (*Id.*)

Fifth, the ALJ considered it significant that "none of the specialists involved with the claimant have opined that she was completely and totally disabled nor have they restricted the claimant from all activities of daily living and work-related activities." (Tr. 31.) The record is scarce of listed functional restrictions. There is a notation that Plaintiff is unable to work due to her dizziness. (*Id.* at 296.) But the notation was made by a physical therapist and not a treating physician. *See Albrecht v. Astrue*, No. Civ. 11-1017, 2012 WL 3156800, at *4 (D. Minn. Aug. 3, 2012) ("While a physical therapist's opinions may be considered valuable because they provide further insight into the health

of a patient, they are not considered 'medical opinions.'"); *see also* 20 C.F.R. § 404.1513(a)(1). There is also a notation indicating that Plaintiff was working under twenty hours each week and "continues to need to do this based upon her headache and additional symptoms." (Tr. 482.) The notation, however, was made prior to the alleged disability onset date and did not elaborate on Plaintiff's ability to perform all work activities or any activities of daily living. (*Id.*)

Sixth, the ALJ found it notable that there was a lack of objective evidence that would otherwise support Plaintiff's subjective claims. Specifically, the ALJ found it notable that a neurological review of Plaintiff's symptoms was negative. (Tr. 30, 637.) Regarding Plaintiff's syncopal episodes, the ALJ noted that "[h]er UPT was negative, her CBC was unremarkable with normal hemoglobin and electrolytes, her EGG showed normal sinus rhythm with no ischemic changes, . . . her Troponin was negative and her urinalysis showed no evidence of infection." (*Id.* at 30, 605.) Additionally, the ALJ found convincing that Dr. Hammack noted that Plaintiff had good strength, her deep tendon reflexes were symmetrical, and plantar responses, flexor, and sensory exam was essentially normal. (*Id.* at 28, 499.) Further, her mental examination was normal. (*Id.*)

Finally, the ALJ noted that Plaintiff had only sought out conservative modalities of treatment explaining that "[c]urrent records showed no significant changes or alterations have been made to the claimant's overall course of conservative care." (Tr. 33–34.) The ALJ found it notable that there was no indication that Plaintiff had availed herself of the Mayo Clinic's Pain Rehabilitation Center despite being determined to be a suitable candidate. (*Id.* at 34; 508.) Nor did Plaintiff take advantage of an

appointment to a sleep specialist offered by Dr. Hammack. (*Id.* at 34; 499.) Conservative

care is a valid reason to question a claimant's credibility. *See Gowell v. Apfel*, 242 F.3d

793, 796 (8th Cir. 2001) (starting that a conservative course of treatment selected by

providers supported the ALJ's adverse credibility determination); *see also Black v. Apfel*,

143 F.3d 383, 386 (8th Cir. 1998) (noting conservative care and lack of surgery

supported ALJ's adverse credibility determination).

In sum, the ALJ discussed substantial evidence in the record when making her

determination regarding Plaintiff's subjective complaints. Because the ALJ gave

sufficient reasons for discounting those complaints, this Court must defer to the ALJ's

credibility determination. *See Renstrom*, 680 F.3d at 1067.

### C.  Other Source Opinion Weight

The ALJ evaluated the opinion of Plaintiff's therapist Ken Little. (Tr. 31.) Little

provided a Medical Source Statement (Mental) on July 18, 2013, and determined that

Plaintiff suffered from a marked impairment in her ability to understand and remember

complex instructions, sustain ordinary routine without special instructions, and complete

a normal workday or workweek without interruptions. (*Id.* at 661-63.) Further, Little

noted an extreme impairment in Plaintiff's ability to maintain attention and concentration,

maintain regular attendance and punctuality, work in coordination and proximity to

others without being distracted, and perform at a consistent pace without an unreasonable

number of rests. (*Id.*) Little also opined that Plaintiff would be off task more than twenty-

five percent of the time and would likely be absent from work more than four days each

month. (*Id.* at 662.) Overall, Little concluded that Plaintiff would be unable to maintain

remunerative employment. (*Id.* at 661.) The ALJ, however, declined to give Little's opinion significant weight. (*Id.* at 31.)

Plaintiff contends that the ALJ erred in evaluating the opinion of Little. (Pl.'s Mem. 18–23.) Plaintiff argues that the ALJ did not properly take into account the length of time Little provided Plaintiff with counseling. (*Id.* at 19.) Further, Plaintiff alleges that the ALJ improperly dismissed Little's opinion without providing the required justifications. (*Id.* at 20–21.) This Court, however, concludes that the ALJ's decision to decline to give significant weight to the opinion of Little is supported by substantial evidence in the record.

A therapist is not an "acceptable medical source" under Social Security regulations. *See* 20 C.F.R. §§ 404.1513(a). "Controlling weight" is reserved for medical opinions from physicians, psychologists, and other acceptable medical sources. *See Tindell v. Barnhart*, 444 F.3d 1002, 1005 (8th Cir. 2006). A therapist is, however, considered "other medical evidence." *See* 20 C.F.R. § 404.1513(d)(1). When evaluating "other medical evidence," the ALJ has more discretion and may consider any inconsistencies found within the record. *See* 20 C.F.R. § 416.927(d)(4); *Raney v. Barnhart*, 396 F.3d 1007, 1010 (8th Cir. 2005). "The evaluation of an opinion from a medical source who is not an "acceptable medical source" depends on the particular facts in each case." SSR 06-3p. Factors for considering opinion evidence from "other medical evidence" include how long the source has known and how frequently the source has seen the individual, how consistent the material is with the other evidence, the degree to which the source presents relevant evidence to support an opinion, how well the source

explains the opinion, whether the source has a specialty or area of expertise related to the impairment, and any other factors which tend to support or refute the opinion. *See* SSR 06-3p; *see also Sloan v. Astrue*, 499 F.3d 883, 889 (8th Cir. 2007). Finally, whether a claimant is disabled or unable to work is an issue specifically reserved to the Commissioner and is entitled to no deference. *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005).

First, the ALJ concluded that the opinion of Little was inconsistent with the "supportive and insight oriented therapy" that Little had been providing Plaintiff. (Tr. 31.) Many of Little's therapy progress notes indicate that he was providing her "supportive counseling" or "supportive and insight oriented counseling." (*Id.* at 376–442.) Further, Dr. Staab noted that Plaintiff's "psychotherapy is focused on only one of the many aspects of difficulty that she is experiencing." (*Id.* at 513.) He explained that "[t]here is certainly reason for her therapist to work with her on family interactions. There is also opportunity for her therapist to help her focus on behavioral and lifestyle modifications[.]" (*Id.*)

Additionally, the ALJ did not give Little's opinion significant weight as he "did not have direct knowledge or management of the claimant's psychiatric/psychological care or medication management," and because "most of his information regarding the effectiveness/ineffectiveness of treatment course, medications, and, . . . symptoms came primarily from the claimant's self-reports and updates." (Tr. 31.) An ALJ may discount an opinion where it is based on subjective complaints and not objective medical evidence. *Kirby v. Astrue,* 500 F.3d 705, 709 (8th Cir. 2007). Plaintiff argues that nothing in the

record indicates Little did not have access to her medical records and diagnoses. (Pl.'s Mem. 20.) However, Little notes that his opinion is based on "behavior familiarity with patient for 4 years, through 118 hour-long therapy . . . sessions." (Tr. 663.) If Little relied on specific reports, laboratory findings, or other objective diagnostic criteria, he certainly could have provided reference to them when prompted to do so. Additionally, Dr. Butler, the neutral medical expert, felt it necessary to qualify Little's opinion noting that it "is from self-report and observation of the therapist as there was no real psychological testing noted in the record." (*Id.* at 63.)

Further, an ALJ may give less weight to a conclusory or inconsistent opinion. *Bernard v. Colvin*, 774 F.3d 482, 487 (8th Cir. 2014); *see also Teague v. Astrue*, 638 F.3d 611, 616 (8th Cir. 2011) ("Substantial evidence supported the ALJ's decision to discount the opinions of Dr. Lowder and Dr. Moore regarding Teague's functional limitations. Dr. Lowder's MSS did not cite clinical test results, observations, or other objective findings as a basis for determining Teague's capabilities."); *Juszczyk v. Astrue*, 542 F.3d 626, 632 (8th Cir. 2008) (noting it was proper for the ALJ to reject an opinion where it "was inconsistent . . . with objective testing, and with other medical evidence in the record."). Here, inconsistencies in the record support the ALJ's determination to deny giving Little's opinion significant weight.

During a mental status examination, Dr. Staab noted that Plaintiff's thoughts were linear and logical and that she was mostly attentive without any evidence of concentration or memory difficulties. (Tr. 512.) Similarly, Dr. Baldus noted that Plaintiff was oriented to person, place, and time, that she performed well on a delayed memory

task, and that her abstract reasoning skills, social judgment, and knowledge of current events was good. (*Id.*at 588.) Further, he assessed Plaintiff as potentially having some difficulty working with the public and difficulty doing work requiring a rapid pace or sustained attention, but would otherwise not have difficulty dealing with the stress of a workplace. (*Id.* at 589.)

Notably, in July 2012, Plaintiff was enrolled in college courses as a full-time student seeking a degree in psychology. (Tr. 505.) She did note that her headaches interfered with her studies. (*Id.* at 383.) However, school attendance can diminish a Plaintiff's credibility. *See Tennant v. Apfel*, 224 F.3d 869, 871 (8th Cir. 2000) (affirming adverse credibility determination based in part on part-time college attendance by claimant alleging disabling pain and fatigue); *see also Johnson v. Colvin*, No. 1:13CV0176 TCM, 2015 WL 778632, at *20 (E.D. Mo. Feb. 24, 2015) (affirming adverse credibility determination based in part on college course attendance).

The neutral medical expert, with whom the ALJ placed great weight due to her specialization in Clinical Psychology, familiarity with the review process, and review of the entire record, opined that the record reflected that Plaintiff's concentration, pace, and persistence were only moderately impaired. (Tr. 62.) She noted that the record indicated that Plaintiff could remember a number of objects for extended periods of time as well as recite seven digits forward and five backward. (*Id.* at 63.) She also pointed to where the record indicated that Plaintiff was rambling and difficult to redirect and that she had difficulty maintaining pace and persistence. (*Id.*) Although she noted that she would not doubt Little's assertion that Plaintiff would be off task twenty-five percent of the time,

she also noted the self-reporting nature of his assessment. (*Id.*) Finally, even taking the above into account, she determined there to be only moderate impairment and opined that a limitation to unskilled through semi-skilled work with brief and superficial contact with others would be sufficient. (*Id.* at 64.)

Based on all of the above, this Court is satisfied that the ALJ properly weighed the opinions within the record. "It is the ALJ's function to resolve conflicts among various treating and examining physicians." *Bentley v. Shalala*, 52 F.3d 784, 785 (8th Cir. 1995). This Court cannot disturb the denial of benefits so long as the ALJ's determination falls within the "available zone of choice." *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008). The decision of the ALJ is not outside the "zone of choice" even where this Court may have reached a different conclusion in the first instance. *Id.* Because the ALJ's decision is supported by substantial evidence in the record and falls within the zone of choice available to her, this Court recommends affirming the ALJ's decision.

## RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.      Plaintiff's Motion for Summary Judgment (Doc. No. 18) be **DENIED**; and

2.      Defendant's Motion for Summary Judgment (Doc. No. 25) be **GRANTED**.


Date: November 19, 2015

                                        *s/ Becky R. Thorson*
                                        BECKY R. THORSON
                                        United States Magistrate Judge

**NOTICE**

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b), a party may file and serve specific written objections to this Report and Recommendation by **December 3, 2015**. A party may respond to those objections within **fourteen days** after service thereof. All objections and responses must comply with the word or line limits set forth in D. Minn. LR 72.2(c).